UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                  Case No. 09-CR-150-WMC

TREVOR LUCAS,

      Defendant.

---

**SENTENCING MEMORANDUM**

**Introduction**

      This memorandum is submitted in support of a defense sentence recommendation for seven years in prison, the mandatory minimum sentence for the offense of conviction. The memo summarizes materials submitted on behalf of the defendant in the form of a medical report from Dr. Jeffrey Marcus, character letters from family and friends of the defendant, and defense comments regarding the presentence report.

      Unlike typical sentencing memoranda, this memo does not focus on the sentencing guidelines as the defense agrees with the presentence author and the government: this is a case covered by 18 U.S.C. §924(c)'s statutory sentence of a mandatory minimum of 7 years. Accordingly, this memo does not discuss pertinent federal sentencing guidelines case law, but instead addresses the factual setting presented before the Court.

**Trevor Lucas [18 U.S.C. §3553(a)(1)]**

As described in the lengthy presentence report and in the accompanying report of Dr. Jeffrey Marcus, Medical Director at Central Wisconsin Center and Clinical Assistant Professor of Psychiatry at the University of Wisconsin, Trevor Lucas has, for most of his life, been diagnosed as suffering from Asperger's Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and Bipolar Disorder. We are addressing this diagnosis at the outset because, quite frankly, it has virtually defined Trevor's life since he was a child. This diagnosis affected him directly and repeatedly, and it did so in fashions that made it obvious to everyone who was in contact with him, including his parents, relatives, teachers, neighborhood acquaintances, counselors, and mental health professionals, that there was something "not quite right" about Trevor Lucas.

This difference between Trevor and other children led to bullying, abusive treatment, and many family disruptions, as demonstrated in the character reference letters from Trevor's parents, Louis and Dorothy, as well as the letter from Attorney Robert Wolfe. The taunting and bullying described in those letters continued far beyond Trevor's childhood years, and extended into adulthood at the hands of neighbors who had the gall to assert to law enforcement officers that Trevor Lucas was an irresponsible, out-of-control, disruptive force in their community. The presentence report referenced a police report recounting the neighbors' claims, but as the Court knows from the defense objections to the PSR, a Massachusetts court found that it was these very neighbors who were the actual cause of the

neighborhood disruption. Further, the defense previously submitted a copy of the court order requiring the neighbors to leave the Lucas family, and Trevor Lucas in particular, alone. It was they who were held in contempt of court for violating the restraining order by continuing their harassment of Trevor, other members of the Lucas family, and other neighborhood families.

One overriding characteristic of Asperger's is the "pronounced difficulty reciprocating emotions and engaging with others interpersonally." Marcus report at 2-3. This difficulty manifested itself during the presentence interview when Mr. Lucas was asked by USPO Baker for the names of friends whom she could contact in connection with the presentence report's preparation: Trevor Lucas stated that he had no friends.

In fact, that statement is both correct and telling. Because of Trevor Lucas' illnesses, he has never formed good, solid relationships with other people. He will tell you that he "got along" with people in school, when he wasn't being taunted, bullied and abused, and he will tell you that he was able to work at part-time jobs when he wasn't being fired or let go because of a lack of need of his services, but in fact, this illness set him up for the conduct which will be discussed later in this memorandum and which constitutes the offense of conviction.

As Dr. Marcus notes, there is one other very significant fact that is simply not addressed in the presentence report and which played a major role in the offense behavior: Mr. Lucas' being prescribed a stimulant medication known as Provigil several weeks prior

to his August, 2009 behavior and arrest. *See* Marcus report at 3-4, 5.  Dr. Wyatt, Mr. Lucas' treating psychiatrist at the time, had utilized Provigil in order to target symptoms of inattentiveness as well as excessive daytime sleepiness which is related to Mr. Lucas' problems with obstructive sleep apnea.  (In case the Court is not aware of this, obstructive sleep apnea causes severe interruption of the REM sleep process, which renders the person seeking sleep extremely tired, leading to the somnolence noted by Dr. Marcus.)

At the time Mr. Lucas was taking Provigil, he was not taking any mood stabilizing medications, which might have offset the effects of Provigil.  This is the other significant point in his medication history.

Mr. Lucas' experience with Provigil was not a good one: It resulted in "the emergence of hyperactive and bizarre behaviors which were out of character for him." Marcus report at 3.  Dr. Marcus describes some of the activities engaged in by Mr. Lucas shortly prior to the August, 2009 behavior that led to his arrest: "very bizarre and excessive wiring of electronic equipment in his bedroom, decreased need for sleep, labile shifts in mood, racing thoughts, increased spending behavior and a notable increase in planning and goal directed activities." Id.

Mr. Lucas' manic symptoms caused his mother to request Dr. Wyatt to lower the Provigil dosage, which he did.  Dr. Wyatt, in September 2009 professional correspondence, corroborated the manic episode and its relationship to Provigil.

Before the activities which led to this offense, Mr. Lucas had no prior juvenile or adult criminal convictions. That is significant, given the fact that he was age 20 at the time of his arrest and had been in the same general community for virtually his entire life. The ability to comply with the law was demonstrated by Mr. Lucas during his life prior to this weapon fixation and medication change. Regarding these points, the reports of Drs. Wyatt and Marcus predict that Mr. Lucas will be able to control any criminal impulses following his certain incarceration for this offense, assuming an appropriate medication schedule.

**The Offense Behavior [18 U.S.C. §3553(a)(1)]**

Mr. Lucas did not contest the factual assertions in the government's offer of proof at the plea hearing, and he does not contest them now. His factual objections to the presentence report already were addressed in the objections filed by counsel on January 31, 2011.

Counsel has not yet received the government's responses to these objections, so we cannot say whether these objections require hearings or are susceptible to being disposed of by agreement of counsel. As soon as counsel receives the government's responses to the defense objections, we will respond and inform the probation department and the court of our anticipated need for a hearing on any of these objections.

There are, however, two issues that bear further discussion in this memorandum: Mr. Lucas' efforts to gain entrance to the home of CG, and Mr. Lucas digging "graves."

The defense understands that, during a police interview, CG's mother asserted for the first time that Trevor Lucas sought to gain entrance to her residence by either pushing, pulling, or both on the front door. Mr. Lucas has absolutely no recollection of engaging in such activity. There is no physical evidence in the form of fingerprints or DNA analysis (although DNA samples were obtained from Mr. Lucas and tests of the door area where he assertively pushed or pulled against the door were conducted.). This attempted forced entry claim is completely inconsistent with statements made at the time the incident was freshest in memory and at a time when, under the law of excited utterance, the statement would have been admissible for its truth even if the person making the statement were not called as a witness. Specifically, the 911 calls reflect simply that the woman at the door screamed and Mr. Lucas immediately fled.

His flight is consistent with the absence of other physical action, e.g. Mr. Lucas did not slam his body against the door, kick the door, hammer against the door, fire his handgun, shout out, or seek entrance through another door or window.

Instead, when she screamed, he fled. This fleeing behavior is the anticipated reaction to a person's hypothetical fantasy world crashing into the harsh reality of a real world response. Mr. Lucas immediately ran to his car, jumped in and drove away, heading for Massachusetts as quickly as he could. Indeed, he was observed speeding in Illinois but was not pulled over because an Illinois trooper was tending to other activity.

As for the digging of "graves," this only can be seen as an attempt by some level of law enforcement to paint a picture of Mr. Lucas that is extremely prejudicial. The simple facts of this case are bad enough for Mr. Lucas without a need to turn holes in which weapons and other gear would be buried in plastic bags into graves. Graves are ordinarily approximately seven feet long, not ten feet long; they are ordinarily two to three feet wide, not five; and they are ordinarily six feet or deeper, not 16 inches deep.

Mr. Lucas' objection to these two assertions does not constitute a denial of any material aspect of the offense, and it is not intended as an effort to deny responsibility for the offense. It is, instead, simply his effort to state what he recalls happening at the door of the entrance to CG's home and his intention with respect to the excavations made in the ground in Massachusetts.

**Likelihood to Re-Offend [18 U.S.C. §3553(a)(2)(A), (B), (C)]**

Again, Dr. Marcus' report is of great significance on this issue, as is the letter of Mr. Lucas himself.

Page six of the Marcus report lists five numbered paragraphs identifying mitigating sentencing factors. The first of them is Dr. Marcus' statement that Mr. Lucas was not able to appreciate the gravity of his offense or the plight of the other individuals at the time of his criminal conduct: "It does not appear that he [Trevor Lucas] possesses the capacity to understand the significance of his threatening behavior." This means, quite simply, that although there is absolutely no doubt that CG's mother was terrified by having a weapon

pointed at her, it is also apparent, however, that Trevor Lucas lacked the ability to understand this consequence, until he had time to reflect upon it. He has now had such time, of course, given the year and a half he has spent in custody on this matter already, and he recognizes that what he did was terribly wrong and was horrendously upsetting to CG's family.

Dr. Marcus' second point is that this behavior occurred during an acute manic episode, likely triggered by the usage of Provigil. "It appears that the process of planning and carrying out the road-trip and criminal conduct was facilitated by his manic state, with features of increased goal-directed behavior, recklessness, and expansivity present." In short, this behavior is likely the product of the drugs which Mr. Lucas was on (Provigil) and was not on (Abilify).

As Dr. Marcus notes in his third numbered paragraph of this discussion, Abilify has been a very good mood stabilizer for Mr. Lucas, and Mr. Lucas was not on Abilify at the time of this incident. Mr. Lucas' return to being medicated with Abilify has produced good results, according to Dr. Marcus.

A sentencing court given these facts would probably ask this reasonable question: "What assurance do I have that this offense will not occur again at the hands of this defendant or another, or, in other words, why should I not warehouse this defendant for the safety of the community?" 18 U.S.C. §3553(a)(2)(C), (B).

The answers to that question are found in numbered paragraphs four and five of Dr. Marcus' report on page six.  Additionally, the projections made by Dr. Marcus on the last page of his report would also factor into the answer to that question.

First, Mr. Lucas is not a person who has antisocial personality features; he is instead a person suffering from interpersonal deficits that accompany Asberger's Disorder.  That distinction is important: if Mr. Lucas were a person who possessed a set of anti-social personality features, one would expect to have seen a lengthy juvenile and adult record by the time Mr. Lucas was arrested for this behavior in 2009.  Instead, as noted earlier, Trevor Lucas has no criminal record, nor does he have a record a juvenile contacts. This point also relates the question of deterrence: deterrence is an appropriate consideration when dealing with anti-social behavior; it is less appropriate when dealing with consequences of medical illnesses. And even if it were a completely appropriate consideration, a seven year sentence for a first offense committed without injury to person or damage to property should adequately deter any other Asperger's sufferer contemplating such behavior.

Second, Mr. Lucas' obvious fixation with firearms is not something that has existed in the past, nor is it likely to continue into the future.  It is consistent, however, with the intense interests commonly seen in individuals with Asperger's Disorder, according to Dr. Marcus.  And, again, it should be noted that the first law enforcement contact that occurred as a consequence of Mr. Lucas' involvement with firearms came about as a consequence of

his father, Louis Lucas, contacting law enforcement to report his son's possession of firearms (which was apparently legal in Massachusetts and under federal law).

That fully responsible parental behavior demonstrates the family support that Trevor Lucas has and will have as he continues with his life. Dr. Marcus notes that "in autistic-spectrum disorders, it is often typical for the objects of interest to change over time. It is very possible that his interest in guns will wane as time passes." Numbered paragraph 5 at page 6. Given that Mr. Lucas will be incarcerated under what the defense urges to be a seven year mandatory minimum sentence, and given the fact that Mr. Lucas will be prohibited from firearm possession for the rest of his life, his interest in guns can e expected to abate.

**Considerations for Incarceration [18 U.S.C. §3553(a)(2)(D)**

Finally, Dr. Marcus makes it clear that Trevor Lucas will need mood stabilizing medication indefinitely, and he will also need a "psychotropic regimen aimed at optimizing effective control and functional status." Marcus report at 7. That is, he will need to be in a setting where his medications can be strictly monitored.

Moreover, with respect to his place of incarceration, Dr. Marcus notes that given Mr. Lucas' interpersonal difficulties, there is concern that he "could potentially be inappropriately treated or victimized by other inmates." That was Trevor Lucas' experience outside incarcerating walls, and there is no reason to expect it will be different when he is in prison. For these reasons, the defense makes a specific sentencing recommendation

which will seek incarceration in the federal medical facility located in Devens, Massachusetts..

**Defense Sentencing Recommendation**

Given Trevor Lucas' lack of any prior criminal record, his acceptance of responsibility for this offense, his remorse for the offense and sorrow for the troubles he has caused the victims in this case, it is respectfully requested that the mandatory minimum sentence of seven years incarceration be imposed. This sentence of seven years will actually function as a much longer sentence, given that Mr. Lucas has already spent a year and a half in custody. Moreover, seven years incarceration for a first offense in which no one was actually injured, no firearm was discharged, and no property was damaged, seems to be an adequate expression of sentence under 18 U.S.C. §3553(a)(2)(A), when Congress has recognized that there are cases for which a term of seven years is sufficient to satisfy the goals of 18 U.S.C. §3553.

But above all these reasons of course, are the medical circumstances of Trevor Lucas as fully outlined in the materials provided to the presentence preparer and to Dr. Marcus. The Marcus report makes it clear that this offense is highly likely related directly to the circumstances of medications in effect for Mr. Lucas in July and August, 2009. Since that time, Mr. Lucas has been on different medications, and has caused no problems in any correctional facility in which he has been housed. Moreover, he has been able to cooperate with counsel, understand these proceedings and decide to acknowledge his guilt and accept

responsibility for his offense. Under these circumstances, the mandatory minimum sentence is appropriate and should be the sentence of this Court.

In imposing this sentence, the Court is respectfully requested to make its recommendation of FMC Devens, Massachusetts as the appropriate incarceration facility. FMC Devens will allow Mr. Lucas to continue receiving the medical treatment he requires, will be staffed with correctional officers familiar with mentally challenged offenders, and is within 30 miles of the Lucas family home to enable his parents' support system to continue. The Court is further requested to encourage the Bureau of Prisons to designate the Essex County Jail in Middleton, Massachusetts, as an extension of his federal custody so that Mr. Lucas may receive credit against his federal sentence for any time spent in that facility awaiting disposition of his Massachusetts related state court case.

Dated at Milwaukee, Wisconsin this 16th day of February, 2011.

Respectfully submitted,

GLYNN, FITZGERALD & ALBEE, S.C.

  s/Stephen M. Glynn
State Bar No. 1013103
Attorney for Defendant Trevor Lucas
Glynn, Fitzgerald & Albee, S.C.
526 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 221-9600
(414) 221-0600 facsimile
sglynn@gfalaw.com